UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| SHARON KAY JERNIGAN, | |
| Plaintiff, | Case No. 2:19-cv-00018 |
| v. | Chief Judge Waverly D. Crenshaw, Jr. |
| | Magistrate Judge Alistair E. Newbern |
| ANDREW M. SAUL,[1] Commissioner of Social Security, | |
| Defendant. | |

To:     The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

## REPORT AND RECOMMENDATION

Plaintiff Sharon Kay Jernigan filed this action under 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying her application for disability insurance benefits (DIB), widow's insurance benefits (WIB), and supplemental security income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–34, 1381–83f. (Doc. No. 1.) Now before the Court is Jernigan's motion for judgment on the administrative record requesting reversal of the ALJ's decision. (Doc. No. 15.) The Commissioner has responded in opposition. (Doc. No. 17.) Having considered the parties' filings and the administrative record as a whole, and for the reasons that follow, the Magistrate Judge will recommend that Jernigan's motion be denied and that the Commissioner's final decision be affirmed.

---

[1]     Andrew M. Saul was sworn in as the Commissioner of Social Security on June 17, 2019. Under Federal Rule of Civil Procedure 25(d), he is automatically substituted as the defendant in this action. Fed. R. Civ. P. 25(d).

# I.     Background

## A.     Jernigan's Application for Benefits

Jernigan filed applications for DIB and SSI on July 11, 2012, and for WIB on October 15, 2012. (AR 268, 275, 291.[2]) Jernigan alleged that, since March 15, 2012, she has been disabled due to depression and "nerves." (AR 309, 313.) The Commissioner denied Jernigan's applications initially and on reconsideration. (AR 61–63, 104–06.) Jernigan requested a hearing before an administrative law judge (ALJ), which was held on October 2, 2014. (AR 50.) On December 9, 2014, the ALJ issued a written decision finding that Jernigan had not been disabled from her alleged onset date of March 15, 2012, through the date of the decision. (AR 50–60.) The Social Security Appeals Council granted Jernigan's request for review, finding that the ALJ had not adequately considered the opinions of non-examining State agency psychological consultants Dr. Jenaan Khaleeli and Dr. Rebecca Sweeney and that the ALJ had not completed a function-by-function assessment of Jernigan's ability to perform work-related mental activities. (AR 136–38.) The Appeals Council remanded Jernigan's claims to the ALJ to address those issues and to allow for further development of the administrative record and an additional hearing, if warranted. (*Id.*)

A second hearing on Jernigan's claims was held on March 30, 2017. (AR 18.) Jernigan appeared at the hearing with counsel and testified. (AR 700–714, 718.) The ALJ also heard testimony from vocational expert Susan Thomas. (AR 714–18.) On June 29, 2017, the ALJ issued a written decision finding that Jernigan had not been disabled from her alleged onset date through

---

[2]      The Transcript of the Administrative Record (Doc. No. 10) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the top right corner of each page.

Case 2:19-cv-00018   Document 18   Filed 07/27/20   Page 2 of 22 PageID #: 787

the date of the decision. (AR 18–32.) In reaching that conclusion, the ALJ made the following

enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.

3. The prescribed period ends on October 31, 2019.

4. The claimant has not engaged in substantial gainful activity since March 15, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

5. The claimant has the following severe impairments: depression, anxiety and intellectual deficits (20 CFR 404.1520(c) and 416.920(c)).

\*        \*        \*

6. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

\*        \*        \*

7. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can understand, remember and carry out simple work, cannot deal with the general public, can deal with coworkers and supervisors up to one-third of the time, can deal with changes up to one-third of the time, and cannot do highly stressful work, such as production quota work.

\*        \*        \*

8. The claimant is capable of performing past relevant work as a hospital cleaner, DOT# 323.687-010. This work does not require performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

\*        \*        \*

3

9. The claimant has not been under a disability, as defined in the Social Security Act, from March 15, 2012, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(AR 21–31.) The Appeals Council denied Jernigan's request for review on January 9, 2019, making the ALJ's decision the final decision of the Commissioner. (AR 8–11.)

## B.    Appeal Under 42 U.S.C. § 405(g)

Jernigan filed this civil action for review of the ALJ's decision on March 10, 2019 (Doc. No. 1), and the Court has jurisdiction under 42 U.S.C. § 405(g).[3] Jernigan argues that the ALJ erred in constructing her RFC by not adopting certain aspects of the opinions of psychological examiners Jerrell Killian and Alice Garland. (Doc. No. 16.) Jernigan also argues that the ALJ erred in finding that she was not disabled under Listing 12.06, which pertains to anxiety and obsessive-compulsive disorders, and that ALJ further erred by not analyzing whether Jernigan was disabled under Listing 12.05, which governs intellectual disorders. (*Id.*) The Commissioner responds that substantial evidence supports the ALJ's RFC findings and that the ALJ properly found that Jernigan does not meet the requirements of either of the listings she mentions. (Doc. No. 17.) Jernigan did not file a reply.

---

[3]     Section 405(g) requires a claimant seeking judicial review of the Commissioner's final decision to file a civil action "within sixty days after the mailing to [her] of notice of such decision or within such further time as the Commissioner . . . may allow." 42 U.S.C. § 405(g). Section 405(g)'s implementing regulation clarifies that the date of mailing is the date that the Appeals Council's notice of final decision is received by the claimant, which is "presumed to be 5 days after the date of such notice, unless there is a reasonable showing to the contrary." 20 C.F.R. § 422.210(c). Accordingly, in most cases, a claimant must file a civil action challenging the final decision of the Commissioner within 65 days of the date on the Appeals Council's notice of final decision. *See Cook v. Comm'r of Soc. Sec.*, 480 F.3d 432, 437 (6th Cir. 2007) (holding that the 65-day period is calculated "from the date on the notice itself"). Here, the Appeals Council's notice of final decision is dated January 9, 2019, and Jernigan timely filed this action on March 10, 2019, 60 days later.

## C. Review of the Record

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of the administrative record. Accordingly, the record will only be discussed to the extent necessary to address the parties' arguments.

## II. Legal Standard

### A. Standard of Review

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405–06 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

## B.     Determining Disability at the Administrative Level

DIB, WIB, and SSI benefits are available to individuals who are disabled, which is defined in this context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (explaining that this definition applies in the DIB and SSI contexts); *Carreon v. Massanari*, No. 01–3552, 2002 WL 31654581, at *1 n.1 (6th Cir. Nov. 21, 2002) (holding that, to establish entitlement to WIB, the claimant must "have a disability as defined in 42 U.S.C. § 423(d)" (citing 42 U.S.C. § 402(e)(1))). While the rules governing DIB, WIB, and SSI define "disability" in the same way, entitlement to one benefit does not necessarily entail entitlement to the other.[4] Title II of the Social Security Act, which governs DIB and WIB, is an insurance program that "provides old-age, survivor, and disability benefits to insured individuals irrespective of financial need." *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988). To receive DIB, Jernigan must establish that she had a disability on or before the last date she was eligible for insurance under Title II, which is determined based on her earnings record. *See* 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.130. To receive WIB, Jernigan "must show that she became disabled within seven years of the death of her fully insured husband." *Carreon*, 2002 WL 31654581, at *1 n.1. Title XVI, on the

---

[4]     The Sixth Circuit has held "that a widow must satisfy a stricter standard of disability than a wage earner." *Dorton v. Heckler*, 789 F.2d 363, 365 (6th Cir. 1986). But that holding was based on a prior version of 42 U.S.C. § 423, which Congress amended in 1990 so that "'the definition of disability for the purpose of determining spouse's . . . benefits would conform with that of applications of wage earner disability claims under Title II[.]'" *Walhood v. Sec'y of Health & Human Servs.*, 875 F. Supp. 1278, 1280 (E.D. Tex. 1995) (first alteration in original) (quoting *Wachter v. Shalala*, 856 F. Supp. 140, 143 (W.D.N.Y. 1991)). In its most recent decision discussing WIB, the Sixth Circuit made no mention of a heightened standard for widows seeking to prove disability. *See Carreon*, 2002 WL 31654581, at *1 n.1.

other hand, "is a welfare program . . . [that] provides SSI benefits to financially needy individuals who are aged, blind, or disabled regardless of their insured status." *Bowen*, 485 U.S. at 75. To receive SSI, Jernigan must show that she was disabled while her application was pending. *See* 20 C.F.R. §§ 416.330, 416.335.

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). For purposes of this case, the regulations governing disability determinations for DIB, WIB, and SSI benefits are identical.[5] *See Colvin*, 475 F.3d at 730 (citing 20 C.F.R. §§ 404.1520, 416.920). At step one, the ALJ considers the claimant's work activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). "[I]f the claimant is performing substantial gainful activity, then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments [that meets the durational requirement], then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the Social Security Administration that "identifies and defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th

---

[5]     The time period relevant to each of Jernigan's claims is distinct: for DIB, Jernigan must prove disability between March 15, 2012, and December 31, 2017; for WIB, she must prove disability between October 12, 2012, and October 31, 2019; and for SSI, she must prove disability between July 11, 2012, and June 29, 2017. However, the parties do not argue that the differences among these time periods are relevant to the Court's analysis of Jernigan's claims, and the vast majority of the evidence they cite comes from the overlap among the periods. Accordingly, differences among the relevant time periods are not discussed in the analysis that follows.

Cir. 2006); *see* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled." *Miller*, 811 F.3d at 834 n.6. If not, the ALJ proceeds to step four. *Combs*, 459 F.3d at 643; *see also Walker v. Berryhill*, No. 3:17-1231, 2017 WL 6492621, at *3 (M.D. Tenn. Dec. 19, 2017) (explaining that "[a] claimant is not required to show the existence of a listed impairment in order to be found disabled, but such showing results in an automatic finding of disability and ends the inquiry"), *report and recommendation adopted by* 2018 WL 305748 (M.D. Tenn. Jan. 5, 2018).

At step four, the ALJ evaluates the claimant's past relevant work and "'residual functional capacity,' defined as 'the most [the claimant] can still do despite [her] limitations.'" *Combs*, 459 F.3d at 643 (alterations in original) (quoting 20 C.F.R. § 404.1545(a)(1)); *see* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. 20 C.F.R. §§ 404.1560(b), 416.960(b). If the claimant's residual functional capacity (RFC) permits her to perform past relevant work, she is not disabled. *Combs*, 459 F.3d at 643. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, "in light of their residual functional capacity, age, education, and work experience," a claimant can perform other substantial gainful employment. *Id.* While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). "Claimants who can perform such work are not disabled." *Combs*, 459 F.3d at 643; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

8

## III.       Analysis

Jernigan argues that the ALJ erred in constructing her RFC by not giving greater weight to certain aspects of the opinions of her psychological examiners. Jernigan also argues that the ALJ erred at step three by concluding that she was not disabled under Listing 12.06 and by not explicitly analyzing whether she met Listing 12.05. These arguments all suffer from the same flaw—they do not discuss the reasons that the ALJ offered to support her conclusions. The narrow question before the Court is whether substantial evidence supports the ALJ's findings. Jernigan cannot show that the ALJ's decision lacks the support of substantial evidence without meaningfully engaging with the evidence upon which the ALJ relied. Upon examination, substantial evidence supports the ALJ's findings, and Jernigan's arguments are without merit.

### A.       Weighing the Medical Opinion Evidence

The ALJ provided the following analysis of the medical opinion evidence:

Drs. Rebecca Sweeney and Jenaan Khaleeli, State agency psychological consultants, reviewed the claimant's records using the listings and "B" criteria that were in effect at the time and concluded that she experiences moderate difficulties and can understand and remember simple and low-level detailed, but not multistep detailed, tasks; cannot make independent decisions at executive level; can maintain concentration, persistence and pace with appropriate breaks for a normal workweek under normal supervision, within the restrictions cited; can occasionally relate to supervisors and coworkers, but cannot interact with the general public; can adapt to infrequent changes; and can get to her workplace, but cannot travel routinely to unfamiliar places. A careful review of their opinions reveals that they considered the areas that are relevant to the listings and criteria that are currently in effect, including adaptation. As such, Drs. Sweeney and Khaleeli's opinions are given significant weight. This includes their suggestion that the claimant cannot handle work that involves interaction with the public. The claimant's [*sic*] interacts with a relatively small group of people regularly with apparent success but appears to experience[ ] discomfort with crowds and possibly with strangers. Her ability to attend church and her ventures into public for basic needs suggests that she can occasionally interact with others, as reflected in the residual functional capacity.

After his first examination, in connection with Dr. Valerio, Mr. Killian opined that the claimant could understand, remember and carry out one to two step tasks. (See Exhibit 5F). This portion of Dr. Valerio's and Mr. Killian's opinion is given significant weight because it is well supported by the evidence demonstrating intact

9

orientation and logic, as well as the claimant's daily activities. Mr. Killian's IQ testing is given some weight, but, in light of the claimant's function and history of substantial gainful activity, the undersigned finds that her adaptive functioning exceeds her academic and intellectual levels of achievement.

Mr. Killian's final opinion was that the claimant socialized well and demonstrated adequate communication and that, in spite of academic deficits and attendant intellectual problems, was capable of learning one to two-step tasks. (See Exhibit 24F). He opined further that she could not be expected to maintain adequate pace and production standards, however. This opinion is given some weight but the suggestion that the claimant cannot maintain pace in a low stress job is not adopted since she has demonstrated those capabilities in the past despite her intellectual issues.

Ms. Garland, in conjunction with Dr. Jerry Campbell, cited mild depression, anxiety and possible borderline intellectual functioning in opining that the claimant has marked to extreme problems with complex decisions, moderate to marked difficulty with complex instructions and moderate difficulty with simple decisions. They opined further that she could understand, remember and carry out simple tasks without difficulty, experienced moderate difficulty with interaction and moderate to marked problem responding to workplace changes. (See Exhibit 26F). This opinion is given some weight. The claimant's abilities to live independently, drive regularly, attend church, assist her sister, care for her dog and manage her finances and medication regimen without help suggest that her adaptive functioning exceeds the levels that her intellectual testing and education would suggest. Further, these activities support the notion that, despite some level of anxiety, the claimant can interact successfully and appropriately, care for herself and others and adapt to stressor[s] and change outside of her home.

(AR 28–29.)

Jernigan argues that the ALJ relied excessively on the opinions of non-examining, consulting physicians Dr. Khaleeli and Dr. Sweeney, which were offered in September 2012 and January 2013 respectively, over the more recent opinions of psychological examiners Killian and Dr. Campbell. (Doc. No. 16.) Specifically, Jernigan argues that the ALJ did not give enough weight to psychological examiner Killian's September 3, 2014 finding that "Jernigan could not perform adequate pace and productivity standards" or Dr. Campbell's September 14, 2016 finding that Jernigan experienced "moderate to marked limitations in the area of responding appropriately to usual work situations and changes in a routine work setting[.]" (*Id.* at PageID# 767.) Jernigan

argues that, if the ALJ had given proper weight to those findings in constructing her RFC, she would have been found disabled. (Doc. No. 16.) The Commissioner responds that the ALJ properly analyzed the medical opinion evidence in the record. (Doc. No. 17.)

In order to assess whether the ALJ properly weighed a particular medical source, the Court "must first determine the medical source's classification." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). In general, a treating source will be given more weight than a source who has examined the claimant but not treated her regularly, and an examining source will be given more weight than a consulting source who has never examined the claimant. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). Put differently, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." *Id.* (alteration in original) (quoting SSR 96–6p, 1996 WL 374180, at *2 (July 2, 1996)). However, state agency medical consultants are considered "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act," *Miller*, 811 F.3d at 834 (alteration in original) (quoting SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996)); therefore, in "'appropriate circumstances,'" a consulting physician's opinion may be entitled to greater weight than that of a treating or examining source, *Blakley*, 581 F.3d at 409 (quoting SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996)). In weighing the opinions of examining and non-examining sources, "the ALJ should consider factors including the length and nature of the treatment relationship, the evidence that the physician offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the physician was practicing in her specialty." *Ealy*, 594 F.3d at 514; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Substantial evidence supports the ALJ's analysis of Killian's opinions. The ALJ considered Killian's status as a psychological examiner who examined Jernigan on three occasions and who was supervised by licensed psychologist Dr. Valerio. The ALJ concluded that Killian's finding, in his first opinion, that Jernigan "could understand, remember and carry out one to two step tasks" was entitled to "significant weight because it [was] well supported by the evidence demonstrating intact orientation and logic, as well as [Jernigan's] daily activities." (AR 29.) Killian's IQ testing, which showed that Jernigan had a full-scale score of 65 (AR 560), received "some weight" because Jernigan's "adaptive functioning exceeds her academic and intellectual levels of achievement." (AR 29.) Finally, Killian's September 3, 2014 opinion received "some weight" because it acknowledged that Jernigan "socialized well and demonstrated adequate communication and that, in spite of academic deficits and attendant intellectual problems, was capable of learning one to two-step tasks." (*Id.*) The ALJ declined to adopt Killian's "suggestion that [Jernigan] cannot maintain pace in a low stress job" because "she has demonstrated those capabilities in the past despite her intellectual issues." (*Id.*) The ALJ's analysis thus shows that she considered Killian's opinions in light of the relevant factors, *see Ealy*, 594 F.3d at 514, and ultimately found that aspects of those opinions were not entitled to significant weight given their inconsistency with other evidence in the record, including Jernigan's daily activities and work history. *See id.* at 515 (holding that ALJ did not err in rejecting examining source's opinion as to claimant's mental function where, among other things, ALJ pointed out that claimant's daily activities did not support examining source's findings). Jernigan does not engage with the ALJ's analysis of Killian's opinions or cite relevant law to support her position. In the absence of any support for her argument, the Court cannot find error in the ALJ's analysis of Killian's opinion.

The ALJ also properly weighed of Dr. Campbell's opinion. The ALJ considered Dr. Campbell's status as a psychological examiner who, in conjunction with Garland, examined Jernigan on September 14, 2016, and opined on her ability to do work-related mental activities. Among other things, Dr. Campbell opined that Jernigan experienced "moderate to marked problem[s] responding to workplace changes." (AR 29; *see also* AR 633.) The ALJ gave that opinion "some weight," finding that Jernigan's "abilities to live independently, drive regularly, attend church, assist her sister, care for her dog and manage her finances and medication regimen without help suggest that . . . [Jernigan] can interact successfully and appropriately, care for herself and others and adapt to stressor[s] and change outside of her home." (AR 29.) Again, beyond her conclusory suggestion that the ALJ should have given Dr. Campbell's opinion more weight, Jernigan offers nothing to support her position. Substantial evidence supports the ALJ's analysis of Dr. Campbell's opinion. *See Ealy*, 594 F.3d at 515.

To the extent that Jernigan argues that the ALJ erred by relying on the opinions of the non-examining consulting physicians over the more recent opinions of the psychological examiners, that argument is without merit. "When an ALJ relies on a non-examining source who 'did not have the opportunity to review' later submitted medical evidence, especially when that evidence 'reflects ongoing treatment,' [the Court] generally require[s] 'some indication that the ALJ at least considered these [new] facts before giving greater weight to an opinion that is not based on a review of a complete case record.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 642 (6th Cir. 2013) (third alteration in original) (quoting *Blakley*, 581 F.3d at 409). Jernigan argues that the ALJ "ignored" the opinions of the psychological examiners "that the combination of the problems from intellectual deficits and anxiety resulted in . . . restrictions in [her] ability to sustain

13

work."[6] (Doc. No. 16, PageID# 768.) But, as just shown, the ALJ analyzed those opinions in light of the relevant factors and found that certain portions of the opinions were not entitled to significant weight given their inconsistency with Jernigan's daily activities, general functioning, and work history. Because the ALJ considered the evidence that postdated the opinions of the non-examining, consulting physicians and adequately explained her weighing of that evidence, the ALJ did not err in according more weight to the opinions of the consulting physicians than those of the psychological examiners.

Substantial evidence supports the ALJ's analysis of the medical source opinions, and therefore Jernigan's request for reversal on this ground fails.

**B.     The Listings**

The Listing of Impairments "describes[,] for each of the major body systems[,] impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Within each listing, the SSA specifies "the objective medical and other findings needed to satisfy the criteria of that listing." *Id.* §§ 404.1525(c)(3), 416.925(c)(3).

---

[6]     Jernigan also argues in passing that the ALJ "failed to build an accurate and logical bridge between the evidence and her conclusion [that Jernigan was not disabled]." (Doc. No. 16, PageID# 768.) To support that argument, Jernigan claims that the ALJ "found the only effect of anxiety on [Jernigan's] functioning was to limit her from performing high paced production work" and that the ALJ "ignored" Jernigan's testimony regarding her anxiety. (*Id.*) These claims are inaccurate. The RFC that the ALJ adopted for Jernigan includes the following other restrictions based on Jernigan's mental health: "cannot deal with the general public, can deal with coworkers and supervisors up to one-third of the time, [and] can deal with changes up to one-third of the time[.]" (AR 24.) Further, the ALJ summarized Jernigan's testimony at length, ultimately concluding that Jernigan's symptoms were not entirely consistent with the evidence in the record. (AR 26.) Jernigan makes no effort to explain how the ALJ erred in analyzing her symptoms, and therefore this argument is too undeveloped to have merit. *See Bailey v. Colvin*, No. 3:15-cv-00815, 2016 WL 4559972, at *7 (M.D. Tenn. Sept. 1, 2016) (collecting cases for the proposition that an undeveloped argument is waived*), report and recommendation adopted by* 2016 WL 5724255 (M.D. Tenn. Sept. 30, 2016).

To be found disabled under the listings, a claimant must demonstrate that she meets the diagnostic description of a given impairment, as well as all of the criteria that follow that description. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing."); 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). The claimant must also satisfy the "duration requirement[,]" 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3), which, unless the SSA specifies otherwise, requires a showing that the impairment "has lasted or can be expected to last for a continuous period of at least 12 months," *id.* §§ 404.1525(c)(4), 416.925(c)(4).

Although the regulations require the ALJ to find a claimant disabled if she meets a listing, "neither the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. Appx. 639, 641 (6th Cir. 2013)). Rather, the ALJ should discuss a particular listing "where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under [that] listing." *Id.* (first alteration in original) (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir.1990)). In analyzing whether a claimant's conditions meet or medically equal one of the listings, an ALJ must "actually evaluate the evidence, compare it to [the relevant listing(s)], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). However, in determining whether the ALJ has met that burden, courts in this circuit have looked to the entirety of the ALJ's opinion and not just the step-three analysis. *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding that "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three"); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (noting that "[t]he

language of 20 C.F.R. § 404.1526 does not state that the ALJ must articulate, at length, the analysis of the medical equivalency issue[,]" and finding that ALJ's minimal step-three analysis was adequate where "[t]he ALJ described evidence pertaining to all impairments, both severe and non-severe, for five pages earlier in his opinion and made factual findings").

An ALJ's failure to provide an adequate step-three analysis is harmless when the claimant has not shown that her impairments met or medically equaled the severity of any listed impairment. *Forrest*, 591 F. App'x at 366. Therefore, unless the claimant "point[s] to specific evidence that demonstrates [she] reasonably could meet or equal every requirement of the listing[,]" the ALJ does not commit reversible error by failing to properly analyze that listing. *Smith-Johnson*, 579 F. App'x at 432.

Here, the ALJ provided the following analysis at step three:

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.04, and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning, which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has moderate limitations. Despite the early termination of her education, the claimant has sufficient abilities in this area to live alone and attend to her household obligations independently. These include performance of chores, grocery shopping, simple meal preparation and driving herself to locations as needed. (See Exhibits 3E, 6F and 26F). Her thought processes remain organized, and, as of the date of her most recent psychological examination, she continued to engage in hobbies, including quilting and crocheting. (See Exhibit 26F). The record reflects probable intellectual deficits, as well as an abbreviated education career. The claimant's activities suggest adaptive functioning that belies those factors and supports moderate difficulties in this area. '

In interacting with others, the claimant has moderate limitations. The claimant asserts that she feels uncomfortable away from her home. However, the record reflects that she engages in regular interactions with family members, sees her sister daily, goes to church regularly and has a group of friends there, and regularly makes outings to drive her sister to town and to attend to various needs, such as shopping for household needs. (See Exhibit 26F). She has evidently been cooperative and appropriate during medical appointments as well. Despite some tendency to isolate, the record suggest that her problems in this are[a] appear are [*sic*] moderate.

With regard to concentrating, persisting, or maintaining pace, the claimant has moderate limitations. Many of the claimant's activities, described above, require some measure of concentration, persistence and maintaining of pace, including meal preparation, quilting, crocheting, driving and living independently. The claimant also care[s] for a dog by herself. Her intellectual deficits likely cause moderate difficulty in this area.

As for adapting or managing oneself, the claimant has experienced moderate limitations. Again, the claimant currently lives alone and manages her household independently, including cooking, managing her finances and medications, caring for her dog, driving, preparing meals and helping her sister. Her[ ] intellectual deficits likely cause some problems in this area, as it is does in other[s], however, her adaptive skills also appear to exceed her intellectual functioning level such that she has at most moderate difficulties in this area.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. There is nothing in the record that suggests that the claimant requires an ongoing, highly structured setting due to [her] mental health issues or that a change in her environment would cause any type of failure to adjust.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and *5* of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental functional analysis.

(AR 23–24.)

Jernigan has failed to point to evidence showing that she met or medically equaled the criteria of the listings she invokes. Any error at step three is therefore harmless.

### 1. Listing 12.06

To meet or medically equal this listing, which covers anxiety and obsessive-compulsive disorders, Jernigan must satisfy the A criteria and either of the B criteria or C criteria. *See* 20 C.F.R. § 404, subpt. P, app. 1, § 12.06. The A criteria require medical documentation of anxiety disorder; panic disorder or agoraphobia; or obsessive-compulsive disorder. *Id.* § 404, subpt. P, app. 1, § 12.06(A). The B criteria require a showing of "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning . . . :" (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* § 404, subpt. P, app. 1, § 12.06(B). The C criteria require a showing that the claimant has "a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of" treatment that reduces symptoms of the disorder and marginal adjustment. *Id.* § 404, subpt. P, app. 1, § 12.06(C).

Jernigan argues that she met Listing 12.06 by satisfying the A criteria and the B criteria. The Commissioner does not address whether Jernigan met the A criteria but argues that she has failed to show that she met the B criteria. Jernigan's only argument regarding the B criteria is the following sentence: "Ms. Jernigan meets the B criteria by being markedly limited in her ability to interact with the general public and markedly impaired in her ability to adapt to changes found in most work situation." (Doc. No. 16, PageID# 767.) In support of that argument, Jernigan cites the results of Killian's September 3, 2014 psychological examination (AR 620–21) and Dr. Campbell's September 14, 2016 examination (AR 627–34).[7]

_____

[7]    In fact, Jernigan cites "(Tr. 622-623, 629-636)." (Doc. No. 16, PageID# 767.) Pages 622 and 623 of the administrative record are notes from appointments that Jernigan had with Dr. Gray Smith in 2015 and 2016 to refill her medications. (AR 622–23.) However, because Jernigan later cites the same pages of the administrative record in an effort to refer to "the reports of Jerrell Killian and Ms. Garland and Dr. Campbell" (Doc. No. 16, PageID# 768), the Court assumes that Jernigan's citation to Dr. Smith's notes was a typo, and that Jernigan instead intended to cite pages

Jernigan has failed to point to specific evidence showing that she could reasonably meet the B criteria. Jernigan does not explain how the evidence she cites demonstrates that she met those criteria or offer any discussion of the ALJ's opinion. The absence of such argument is especially glaring given that the ALJ explicitly considered the B criteria at step three, finding that Jernigan suffered from only moderate limitations in the relevant functional areas, and cited Dr. Campbell's opinion and Jernigan's daily activities to support those findings. (AR 23–24.) In fact, Dr. Campbell found that Jernigan suffered from moderate to marked impairment of her ability to interact appropriately with the public and respond appropriately to usual work situations, which is consistent with the ALJ's conclusion that Jernigan's limitations in the areas covered by the B criteria are moderate. Finally, as discussed above, the ALJ thoroughly analyzed the opinions of Dr. Campbell and Killian and explained why they were not given more weight. By citing those opinions without any argument or analysis, Jernigan has not identified specific evidence that demonstrates that she met the B criteria, and therefore she has failed to show that she met or medically equaled the requirements of Listing 12.06. *See Ware v. Comm'r of Soc. Sec.*, No. 2:17-cv-01015, 2019 WL 696945, at \*14 (S.D. Ohio Feb. 20, 2019) (finding that plaintiff had "not adequately support[ed] her assertion that she met or medically equaled Listings 12.04 and/or 12.06" where her only argument was "that the ALJ should have accepted" the opinion of an examining physician, which the ALJ had adequately weighed), *report and recommendation adopted*, 2020 WL 2085200 (S.D. Ohio Apr. 30, 2020); *Boles v. Berryhill*, No. 2:16-cv-00059, 2017 WL 3116435, at \*6 (M.D. Tenn. July 21, 2017) (finding that, "[a]bsent any real attempt to challenge the ALJ's [L]isting 12.06 finding, [plaintiff's] claim [based on failure to properly

---

620 and 621 of the administrative record, which correspond to Killian's September 3, 2014 examination (AR 620–21).

analyze that listing was] meritless"), *report and recommendation adopted sub nom. Boles v. Soc. Sec. Admin.*, 2017 WL 3671367 (M.D. Tenn. Aug. 8, 2017). Accordingly, any error in the ALJ's analysis of Listing 12.06 is harmless. *See Smith-Johnson*, 579 F. App'x at 432.

### 2.      Listing 12.05

To meet or medically equally this listing, which corresponds to intellectual disorder, Jernigan must satisfy either the A criteria or the B criteria. 20 C.F.R. § 404, subpt. P, app. 1, § 12.05. Here, because Jernigan was able to take an IQ test, only the B criteria are relevant. *See Drake v. Berryhill*, No. 1:17CV2404, 2018 WL 4689591, at *19 n.11 (N.D. Ohio Sept. 28, 2018) (explaining that the A criteria are "for claimants whose cognitive limitations prevent them from being able to take a standardized intelligence test" while the B criteria are for those "who are able to take a standardized intelligence test"). To satisfy the B criteria, Jernigan must show significantly subaverage general intellectual functioning as evidenced by an IQ test. 20 C.F.R. § 404, subpt. P, app. 1, § 12.05(B)(1). She must also show "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning:" (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* § 404, subpt. P, app. 1, § 12.05(B)(2). Finally, she must show that "[t]he evidence about [her] current intellectual and adaptive functioning and about the history of [her] disorder demonstrates or supports the conclusion that the disorder began prior to [her] attainment of age 22." *Id.* § 404, subpt. P, app. 1, § 12.05(B)(3).

Jernigan has failed to point to specific evidence demonstrating that she meets the B criteria. The criteria of Listing 12.05(B)(2) are identical to the criteria of Listing 12.06(B), discussed above. *Compare* 20 C.F.R. § 404, subpt. P, app. 1, § 12.05(B)(2), *with id.* § 404, subpt. P, app. 1, § 12.06(B). Therefore, although the ALJ did not explicitly consider whether Jernigan met or medically equaled Listing 12.05, the ALJ considered the functional areas relevant to

Listing 12.05(B)(2), finding that Jernigan suffered from only moderate limitations. Jernigan argues that she meets the 12.05(B)(2) criteria by being "markedly limited in her ability to understand[ ], reme[m]ber[ ], and apply[ ] information" and "by being markedly impaired in her ability to adapt to changes found in most work situations." (Doc. No. 16, PageID# 769.) In support of that claim, Jernigan again cites Killian's September 3, 2014 psychological examination (AR 620–21) and Dr. Campbell's September 14, 2016 examination (AR 627–34). But Jernigan does not engage at all with the ALJ's actual analysis of the criteria relevant to 12.05(B)(2)—in which the ALJ found that Jernigan's daily activities and general functioning supported only moderate limitations (AR 23–24)—nor does she explain how the ALJ erred in analyzing Killian's or Dr. Campbell's opinions. As discussed above, substantial evidence supports the ALJ's analysis of those opinions. Jernigan has failed to point to specific evidence showing that she could reasonably meet or medically equal the requirements of Listing 12.05(B)(2). Therefore, to the extent that the ALJ erred in failing to explicitly analyze whether Jernigan was disabled under Listing 12.05, any such error was harmless. *See Smith-Johnson*, 579 F. App'x at 432.

## IV.  Recommendation

For the foregoing reasons, the Magistrate Judge RECOMMENDS that Jernigan's motion for judgment on the administrative record (Doc. No. 15) be DENIED and that the decision of the Commissioner be AFFIRMED.

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 27th day of July, 2020.

ALISTAIR E. NEWBERN
United States Magistrate Judge